**Lloyd Anthony HARRIS, Petitioner, Appellant,**

v.

**STATE of Minnesota, Respondent.**

**No. C1–86–1543.**

Court of Appeals of Minnesota.

Feb. 3, 1987.

Review Denied March 18, 1987.

C. Paul Jones, Minnesota State Public Defender, Mark F. Anderson, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Thomas Foley, Ramsey Co. Atty., Darrell C. Hill, Asst. Ramsey Co. Atty., St. Paul, for respondent.

Considered and decided by CRIPPEN, P.J., and LANSING and NIERENGARTEN, JJ., with oral argument waived.

## OPINION

NIERENGARTEN, Judge.

This is an appeal from an order denying Lloyd Anthony Harris' petition for post-conviction relief. We affirm.

## FACTS

During the early morning hours S.C. was awakened in her apartment by a gloved hand around her face. She was pulled from her bed as a knife was held to her throat and was told to keep quiet or both she and her three year old daughter would be killed. The apartment was dark and S.C. could not see the assailant. Her hands were tied behind her and parts of her clothing were torn or cut from her body and tied over her face and she was raped. After the assailant left, S.C. went to an upstairs apartment and told her boyfriend's niece that she had been raped. The police were dispatched to the scene at 4:47 a.m.

S.C. told the investigating officers that the attack lasted from forty to forty-five minutes and later testified at trial that when she looked at the clock in the niece's apartment it was about 4:00 a.m. She told the officers that she smelled a gasoline odor on the glove that covered her face and smelled alcohol on the assailant's breath. She said she identified the assailant as "Tony" Harris because she recognized his voice. Although the assailant was behind her, she said she also recognized him because of his height and a limp.

The niece told the officers that approximately fifteen minutes before S.C. came to her door, she looked out the window and saw a car with a dark bottom and a beige top leaving the lot. She said S.C. was shaking badly when she came to the apartment.

One of the officers testified that she noticed a wet shoe print on the front concrete step to the Harris apartment which could have been made by a tennis shoe, but the print had evaporated ten or fifteen

minutes later. The officers later took a pair of damp tennis shoes from Harris' apartment. One of the officers testified that he detected "a slight odor of alcohol" on Harris' breath.

Officers accompanied Harris to his car which one officer described as "a white over maroon Dodge," and another described as "white over brown." Two officers examined the engine and air cleaner about 5:15 or 5:30 a.m. and noted that they were warm, although Harris had said the car had been parked since about 12:00 a.m. One of the officers who felt the engine and who testified to having worked on cars stated that, based on the warmth of the engine, she did not believe the car had been parked earlier than about 4:00 a.m.

The officer who first searched the inside of the car said he noticed a gasoline odor and smelled a slight gasoline odor on Harris' hands. The car subsequently was impounded by the police who recovered two pairs of gloves, some tissues, a towel, and a knife from the car. A small pocket-sized knife also was found in one of Harris' pockets during a patdown search.

At about 6:00 a.m., S.C. had been taken to the hospital for a medical examination where the treating physician noticed scratches on her neck which were compatible with knife scratches and bruises on one of S.C.'s knees; attending nurses noticed bruises on S.C.'s wrists. A social worker who talked to S.C. at the hospital stated that she was very upset and frightened like many of the rape victims he has interviewed at the hospital. At the hospital, S.C. positively identified Tony Harris as the person who had assaulted her. The police testified that S.C. was shaken and frightened when she saw Harris at the hospital and that she later was crying when she was making a telephone call.

Tests conducted by a hospital physician indicated that the fluids from a vaginal swab contained nonmotile (nonmoving) sperm and seminal fluid, and estimated that they had been introduced into S.C. sometime after midnight. The doctor stated that the results of his analyses were consistent with vaginal penetration within approximately three to four hours of the examination.

The vaginal swab subsequently was analyzed by lab technicians at the Minnesota Bureau of Criminal Apprehension. The technicians also analyzed blood, hair, and saliva samples from S.C., Harris, and S.C.'s boyfriend, with whom S.C. last had sexual relations on the preceding Friday. Although the lab tests could not positively identify the donor of the fluids in the vaginal fluid specimen, neither Harris nor S.C.'s boyfriend could be eliminated as possible donors.

The evidence on how Harris entered the apartment was inconclusive. The police did discover shoe marks with traces of mud in the snow beneath the bedroom window, but no mud was found on the outside wall of the building or in S.C.'s apartment. Harris admitted at trial that the shoe marks probably were his and said he had met S.C. secretly on at least three occasions and had rapped on her bedroom window a few days before the assault.

S.C. and Harris were well-acquainted and Harris sometimes went out with S.C. and her boyfriend. S.C. told the police officers that she recognized her assailant's voice as that of Harris because she remembered his voice and certain words he used while playing with his children.

Harris says that he engaged in sexual relations with S.C. on at least two prior occasions and last entered S.C.'s apartment two days before the alleged assault by way of a window because he was told someone was watching S.C.'s apartment. S.C. denies the allegations.

Harris testified that on the night of the assault, he left work at 11:00, stopped at a gas station for gas and oil, and then went to a bar and had a couple of drinks. Although he told police on the morning of the assault that he arrived home about 12:00, he testified at trial that he arrived at his home after 1:30.

The jury returned a guilty verdict and Harris was sentenced to concurrent terms

of sixty-five months for the first degree criminal sexual conduct offense and forty-one months for the first degree burglary offense. Harris filed a petition for postconviction relief contending that the evidence was insufficient to support the convictions for burglary and criminal sexual conduct, and that he was denied a fair trial when the prosecutor inquired about prior convictions during cross examination. He appeals from the order denying relief.

## ISSUES

1. Was the evidence sufficient to support Harris' conviction for burglary and criminal sexual conduct?

2. Was Harris denied a fair trial when the prosecutor questioned him about prior convictions during cross examination?

## ANALYSIS

### 1. Sufficiency of the Evidence

A conviction may be upheld and the verdict will not be disturbed on appeal if there is sufficient evidence in the record to support the postconviction court's order denying relief. *See Doughman v. State,* 351 N.W.2d 671, 674 (Minn.Ct.App.1984).

■ The jury reasonably could conclude from the evidence that S.C. was assaulted and raped on the morning of April 2, 1985. *See State v. Reinke,* 343 N.W.2d 660, 662 (Minn.1984) (discussing similar facts supporting an allegation of rape). The jury reasonably could conclude from the evidence that Harris was the person who assaulted and raped S.C. Although S.C. never saw her assailant, S.C. identified Harris' voice, based upon her prior acquaintance with him. *See State v. Otten,* 292 Minn. 493, 494, 195 N.W.2d 590, 591 (Minn. 1972) (in addition to other evidence, the victim's identification of her assailant's voice "was direct evidence sufficient to present a fact question for the jury to determine").

Harris offered evidence to show he was not the assailant. The record as a whole contains sufficient evidence from which a jury could conclude beyond a reasonable doubt that Harris was guilty. *See State v. Reichenberger,* 289 Minn. 75, 79, 182 N.W.2d 692, 695 (1970) ("the task of weighing [witness] credibility was for the jury," not the appellate court); *State v. Beard,* 380 N.W.2d 537, 541 (Minn.Ct.App.1986), *pet. for rev. denied,* (Minn. Mar. 3, 1986) ("On review, this court will assume the jury believed the State's witnesses and disbelieved any contradictory testimony").

S.C. did make some statements at trial that were not entirely consistent with statements she made to police investigators shortly after the assault. However, "minor inconsistencies between [the victim's] testimony and her previous statements are not grounds for reversing the jury's guilty verdict." *Beard,* 380 N.W.2d at 541.

### 2. Prior Conviction Testimony

■ Harris contends he did not receive a fair trial because he was questioned about prior convictions during cross examination by the prosecutor. The convictions initially were brought to the jury's attention during direct examination by defense counsel. Harris' attorney did not object to the questioning during cross examination.

The credibility of a witness may be attacked by introducing evidence of certain prior convictions.

> [E]vidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year * *, or (2) involved dishonesty or false statement, regardless of the punishment.

Minn.R.Evid. 609(a).

The questioning on cross examination was not unduly prejudicial. The convictions initially were elicited from Harris on direct examination; Harris was in fact convicted of a felony; and the trial court properly instructed the jury to consider Harris' prior convictions only for the purposes of determining credibility and not for the purposes of deciding guilt in this particular trial. *See State v. Brouillette,* 286 N.W.2d

702, 707 (Minn.1979) (evidence of prior convictions may have impeachment value if it aids the jury in determining the witness' credibility); *see also Hanson v. State,* 344 N.W.2d 420, 425 (Minn.Ct.App.1984) (the trial court's cautionary instructions limited any prejudicial effect resulting from the introduction of prior conviction evidence).

### DECISION

Harris' petition for post-conviction relief was properly denied. The evidence contained in the record is sufficient to sustain the jury's guilty verdict. Under the circumstances, the prosecutor's questions about Harris' prior convictions were not unduly prejudicial.

Affirmed.